# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

CHADWICK PARKER and AMBER PARKER, individually and as parents and natural guardians of H.P., a minor,

Plaintiffs,

v.

COLUMBIA COUNTY SCHOOL DISTRICT; TRACY L. HENRICKS, in her individual capacity; CHASE A. FORD, in his individual capacity; and BRIANA HENDERSON, in her individual capacity; EPIC SPECIAL EDUCATION STAFFING; STONE HARBOR STAFFING GROUP, INC. (f/k/a EPIC STAFFING GROUP, INC.); THERAPYTRAVELERS, LLC; and 3CHORDS, INC.,

Defendants.

Civil Action No.: ____________________

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiffs Chadwick Parker and Amber Parker, individually and as parents and natural guardians of H.P., a minor, state their Complaint against Defendants as follows:

## I. INTRODUCTION

1. H.P. is a nonverbal boy with level 3 autism spectrum disorder, ADHD, and epilepsy. He was nine years old at the time of the abuse described below.

2. During the 2024–2025 school year, the adults responsible for his care in his self-contained autism classroom at Lewiston Elementary School abused him. They grabbed him, penned him behind furniture, took his food as punishment, mocked his disability, and berated him — conduct captured on hours of recorded audio, and corroborated by the School District’s own surveillance video.

3. The Columbia County School District's own investigation confirmed the abuse within days. Its School Resource Officer documented the physical abuse by video timestamp. Its principal found that two paraprofessionals violated the Georgia Code of Ethics for Educators. Both paraprofessionals resigned in lieu of termination. The Georgia Professional Standards Commission later found that they abused H.P. and suspended their educator certificates.

4. The abuse of H.P. was not isolated. Before November 2024, the District had notice of similar mistreatment of vulnerable students in its schools — including a paraprofessional's restraint of a ten-year-old at Evans Elementary

in 2022 and the video-recorded battery and force-feeding of a disabled student at Euchee Creek Elementary in 2023 — and of mounting warning signs in H.P.'s own classroom. The District nonetheless failed to train, supervise, or discipline the staff of its self-contained special-education classrooms, failed to report abuse as Georgia law requires, and left H.P. in the hands of his abusers.

5. Plaintiffs bring this action under 42 U.S.C. § 1983 for violations of H.P.'s Fourteenth Amendment rights, under Section 504 of the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act against the District, and under Georgia law against the individual Defendants. Plaintiffs also bring Georgia-law claims against Henderson's employer — the Epic staffing entities defined below — which supplied her to the District and are liable for her conduct and for their own. Chadwick and Amber Parker also assert, in their individual capacities, their claims under Georgia law for the medical and related expenses they have incurred and will incur for H.P. during his minority and for the loss of his services.

## II. JURISDICTION AND VENUE

6. This Court has subject-matter jurisdiction over Plaintiffs' federal claims under 28 U.S.C. §§ 1331 and 1343 because those claims arise under the Constitution

and laws of the United States, including 42 U.S.C. § 1983, 29 U.S.C. § 794, and 42 U.S.C. § 12132.

7. This Court has supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367 because those claims form part of the same case or controversy as the federal claims.

8. This Court has personal jurisdiction over each Defendant. The District is a political subdivision of the State of Georgia. Henricks, Ford, and Henderson are domiciled in Georgia. The Epic Defendants are registered with the Georgia Secretary of State to transact business in Georgia, maintain a registered agent and registered office in Georgia, and committed in Georgia the acts and omissions alleged in this Complaint.

9. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because all Defendants are residents of the State of Georgia and at least one Defendant resides in this District. More specifically, Henderson is domiciled in Fulton County, Georgia, which lies within this District. The Epic Defendants reside in this District under 28 U.S.C. § 1391(c)(2) and (d): each is registered to transact business in Georgia, maintains its registered agent and registered office in Gwinnett County, Georgia, and has contacts with this District sufficient to subject it to personal jurisdiction here. Venue is proper in the

Atlanta Division under Local Rule 3.1(B) because Fulton County and Gwinnett County lie within that Division.

10. Plaintiffs' claims for damages arising from H.P.'s physical and emotional injuries are not subject to the administrative-exhaustion requirement of the Individuals with Disabilities Education Act because they do not seek relief for the denial of a free appropriate public education. *See Fry v. Napoleon Community Schools*, 580 U.S. 154 (2017).

## III. PARTIES

11. Plaintiffs Chadwick Parker and Amber Parker are the parents and natural guardians of H.P. They reside in Columbia County, Georgia. They sue individually and on H.P.'s behalf.

12. H.P. was born in 2015. At all relevant times he was a student in the self-contained autism spectrum disorder (ASD) classroom at Lewiston Elementary School in Evans, Georgia. H.P. is nonverbal and has been diagnosed with level 3 autism spectrum disorder, ADHD, and epilepsy. He communicates primarily through an assistive communication device and depends on the adults around him for comfort, food, and safety.

13. Defendant Columbia County School District (the "District") is a political subdivision of the State of Georgia that operates the public schools of

Columbia County, including Lewiston Elementary School. The District receives federal financial assistance, including funds under the Individuals with Disabilities Education Act, and is a public entity within the meaning of Title II of the ADA. The District acts under color of state law. The District may be served through its chief executive officer, Superintendent Steven Flynt, Ed.D., at 4781 Hereford Farm Road, Evans, Georgia 30809, or as otherwise permitted by Fed. R. Civ. P. 4(j)(2) and O.C.G.A. § 9-11-4(e)(5).

14. Defendant Tracy L. Henricks was at all relevant times a paraprofessional employed by the District and assigned to H.P.'s self-contained ASD classroom, where she had worked for more than three years. She is sued in her individual capacity. At all relevant times she acted under color of state law. Henricks may be served at 4718 Bantry Road, Grovetown, Georgia 30813.

15. Defendant Chase A. Ford was at all relevant times a paraprofessional employed by the District and assigned to H.P.'s self-contained ASD classroom. He is sued in his individual capacity. At all relevant times he acted under color of state law. Ford may be served at 817 Dara Cors, Grovetown, Georgia 30813.

16. Defendant Briana Henderson was at all relevant times the teacher of H.P.'s self-contained ASD classroom. The Epic Defendants (defined below)

employed her and supplied her to the District as a contract special education teacher. She is sued in her individual capacity. Henderson is domiciled in Fulton County, Georgia, and may be served at 3122 Abbey Drive SW, Atlanta, Georgia 30331.

17. Defendant 3Chords Inc. ("3Chords") is a California corporation (California Secretary of State Entity No. 3493650) with its principal office at 2041 Rosecrans Avenue, Suite 245, El Segundo, California 90245. 3Chords is registered with the Georgia Secretary of State as a foreign profit corporation (Control No. 20238089) and maintains its registered office in Gwinnett County, Georgia. 3Chords may be served through its Georgia registered agent for service of process, Corporation Service Company, 2 Sun Court, Suite 400, Peachtree Corners, Georgia 30092, or as otherwise permitted by Fed. R. Civ. P. 4(h).

18. Defendant TherapyTravelers LLC ("TherapyTravelers") is a California limited liability company (California Secretary of State Entity No. 201723010336) with its principal office at 2041 Rosecrans Avenue, Suite 245, El Segundo, California 90245. TherapyTravelers is registered with the Georgia Secretary of State as a foreign limited liability company (Control No. 20029775) and maintains its registered office in Gwinnett County, Georgia.

TherapyTravelers may be served through its Georgia registered agent for service of process, Corporation Service Company, 2 Sun Court, Suite 400, Peachtree Corners, Georgia 30092, or as otherwise permitted by Fed. R. Civ. P. 4(h).

19. 3Chords and TherapyTravelers do business together under the name "Epic Special Education Staffing" ("ESES"), formerly "TherapyTravelers." Defendant Stone Harbor Staffing Group, Inc., formerly known as Epic Staffing Group, Inc. ("Stone Harbor"), is the parent of 3Chords and TherapyTravelers and shares their El Segundo, California headquarters. Stone Harbor is a Delaware corporation registered with the Georgia Secretary of State as a foreign profit corporation (Control No. 22209412); its amended certificate of authority reflects its change of name from Epic Staffing Group, Inc. to Stone Harbor Staffing Group, Inc. effective August 28, 2026. Stone Harbor maintains its registered office in Gwinnett County, Georgia, and may be served through its Georgia registered agent for service of process, Corporation Service Company, 2 Sun Court, Suite 400, Peachtree Corners, Georgia 30092, or as otherwise permitted by Fed. R. Civ. P. 4(h). ESES is the trade name under which 3Chords and TherapyTravelers operate and may be served through those entities' Georgia registered agent at the same address.

3Chords, TherapyTravelers, ESES, and Stone Harbor are referred to collectively as "Epic" or the "Epic Defendants." At all relevant times, Epic transacted business in Georgia by supplying special-education personnel to Georgia public school districts, including the District.

20. Effective July 1, 2024, Epic entered into a Master Service Agreement (the "MSA") with the District. Carol Cheney signed the MSA for Epic as President of 3Chords and TherapyTravelers. Sharard Pritchett, the District's Director of Special Services, signed the MSA for the District.

21. In the MSA, Epic and the District agreed that any Associate who Epic assigned to the District "shall perform all Services as an independent contractor to the [District] and not as an employee, agent, partner, or venture participant of the [District]."

22. In the MSA, Epic disclosed that it "typically conducts a limited background check," that it checks an Associate's references "only by posing specific questions to certain past employers regarding skills and work history," and that it "does not engage in any additional verification process" unless the client district requests additional verification in writing.

23. On September 12, 2024, Epic and the District entered into a Staffing Confirmation Agreement under which Epic assigned Henderson to the District

as a special education teacher for the period September 30, 2024 through May 24, 2025, at a bill rate of $75.00 per hour. The Staffing Confirmation Agreement acknowledges that Henderson "is an employee of Epic Special Education Staffing," not the District.

24. At all relevant times, Epic employed Henderson as its W-2 employee. Epic paid her hourly wages of $38.00 per hour, withheld her payroll taxes, provided her medical, dental, and vision benefits, maintained her personnel file, retained the right to discipline, reassign, and terminate her, and supplied her classroom services to the District, on an independent-contractor basis, at a bill rate of $75.00 per hour.

25. Epic's Employee Handbook governed Henderson's employment. It provides that her employment is "at-will" with Epic; that Epic may change her "duties, and location of work" at any time; that an involuntary termination is one "initiated by the Company"; and that Epic may impose corrective discipline. The Handbook defines "Supervisor" as "the designated manager or leader, either from the Company or the Client," requires employees to arrange absences with their "Supervisors (both from the Company and the Client)," and directs employees to raise work problems first with their "Company

Supervisor." Epic's staff, not the District, approved Henderson's weekly timesheets.

26. Epic's Handbook designates every Epic employee who has regular contact with children as a mandated reporter and requires each to report "any suspected or known incidents of child abuse or neglect to their Company or District Supervisor and the appropriate authorities," on pain of "disciplinary action up to and including termination of employment." On September 13, 2024 — seven weeks before the events described below — Henderson completed Epic-required training titled "Mandated Reporters: Critical Links in Protecting Children in Georgia."

## IV. FACTUAL ALLEGATIONS

### A. Duties of Classroom Personnel

27. Georgia law and the District's own policies impose duties on the personnel who staff special-education classrooms.

28. A classroom teacher owes her students a duty to monitor, supervise, and control the classroom. That duty includes protecting students from harm inflicted by others in the classroom, including paraprofessionals.

29. Paraprofessionals are support staff. By statute, they may exercise classroom authority only while "under direct supervision of classroom teachers." O.C.G.A. § 20-2-215.

30. The District's job description for special-education paraprofessionals matches the statute: the paraprofessional works "under the supervision of the classroom general and/or special education teacher" and follows "the lead and directions of the supervising teacher."

31. Georgia law prohibits paraprofessionals from administering corporal punishment. O.C.G.A. § 20-2-215. Corporal punishment may be administered only by a principal or teacher, and only under written board policies with strict safeguards. O.C.G.A. §§ 20-2-730, 20-2-731. Any corporal punishment administered by a paraprofessional is unauthorized by Georgia law.

32. Teachers and paraprofessionals are mandatory reporters of suspected child abuse. O.C.G.A. § 19-7-5. District policy requires any employee who suspects child abuse to report it immediately, and in no case later than 24 hours. The District's own training instructs employees that they need not be certain that abuse occurred before reporting, and it warns that children with disabilities are especially vulnerable to abuse and neglect.

**B. H.P. and His Classroom**

33. Because of his disabilities, H.P. cannot speak. He cannot tell his parents what happens to him at school. The District placed him in a self-contained ASD classroom at Lewiston Elementary precisely because he requires specialized instruction and care from staff trained to serve children with significant disabilities.

34. H.P.'s individualized education program required staff to support his communication through his assistive communication device and to follow protocols addressing his seizure disorder and feeding.

35. During the 2024–2025 school year, the classroom staff consisted of paraprofessionals Henricks, Ford, and Heather Maynard, under a succession of teachers.

36. Lakisha Didley, hired in August 2024, abandoned the classroom without notice on or about August 20, 2024, following a confrontation over her denial of recess to a child as punishment.

37. For approximately six weeks, the District left the classroom in the hands of the paraprofessionals under a special-education specialist.

38. In late September 2024, the District filled the vacancy through Epic, which supplied its employee Henderson to run the classroom as a contract teacher

under the MSA and the Staffing Confirmation Agreement. Her placement ran from September 30, 2024 through May 24, 2025.

39. Henderson held only a bachelor's-level certificate, though she signed school correspondence as holding a master's degree. Henderson's résumé claimed "ten years of experience teaching K-8 general education and special needs students." Epic's employment application for her contained no employment history, and Epic contacted a single reference — the director of a youth club — before placing her in the classroom.

40. On September 23, 2024, the District's human resources office ran its own background check on Henderson and retrieved her Georgia Professional Standards Commission certification record, which showed a Level 4, bachelor's-level certificate. Neither Epic nor the District verified her claimed master's degree or her claimed teaching experience.

**C. Warning Signs the District Ignored**

41. Beginning around 2021, H.P. began crying at school and at home without apparent cause. His parents consulted multiple medical specialists. No medical explanation was found.

42. In 2022, the parent of another child in the classroom warned Amber Parker that her own child cried around Henricks and asked whether Ms. Parker had ever had a "weird feeling" about her.

43. Between 2022 and 2024, H.P. came home from school multiple times with unexplained injuries, including: an ankle injury in 2022; a large knot on the side of his head in March 2024; and a second ankle injury in August 2024. The school prepared no incident report and offered no explanation for any of the injuries.

44. Beginning in August 2024 and escalating through the fall, H.P. fell to the floor of the car after school, cried when his mother packed his lunch, and showed distress his parents had never seen before.

45. On August 14, 2024, after the second ankle injury and repeated episodes of severe distress at drop-off, Amber Parker emailed the school demanding an urgent meeting and wrote that she did not want H.P. "stepping foot in that classroom again."

46. On September 17, 2024, Amber Parker discovered a mark on the inside of H.P.'s upper arm consistent with a forceful grab and emailed photographs to the school the same day. The school prepared no incident report and suggested a name tag caused the mark.

47. Indeed, the District acted on none of the foregoing warnings.

**D. The November 1, 2024 Recording**

48. On the morning of November 1, 2024, H.P. cried severely before school. Out of concern, Amber Parker placed a small audio recorder in his backpack. At 8:24 a.m. that morning, she also emailed the school's special-education specialist, described H.P.'s distress, and asked her to check on him. The recorder captured H.P.'s school day, from approximately 8:30 a.m. to 1:00 p.m.

49. The recording captured Henricks ordering H.P. to "get back in your hole," commanding him to "SIT DOWN!" and "Stay in the box!," and saying "I don't care dude" and "I'm not giving him anything else, he can cry."

50. The recording and the District's surveillance video captured Henricks grabbing H.P. by the back of his shirt collar and pulling him backwards, then grabbing his right wrist; yelling "Sit down or I'm going to take it" and pushing a table against H.P. and the wall; and removing H.P.'s lunch tray minutes after he received it, as punishment, while the other children continued eating.

51. The recording captured Ford verbally abusing H.P. and other disabled children — including yelling "That is enough!" and "Why do I gotta get mad

at you!" — and, as the District's surveillance video confirmed, repeatedly blocking H.P. behind his desk to confine him.

52. The recording captured staff, including Henderson, mocking H.P. and his mother and deriding the parents of children with autism in front of the children. Ford declared that he was "sick and tired of parents trying to diagnose children with something they don't have because of their lack of parenting. It's behavior." Henricks agreed: "Absolutely." Henricks mocked H.P.'s upcoming psychological evaluation: "I can't wait for them to test him," adding, to staff laughter, "I'm gonna say good luck, you're gonna need it."

53. Henderson, the classroom teacher, participated in the derision of H.P.'s mother and other parents, joined the conversation disparaging H.P.'s family, and took no step to stop the abuse occurring in her classroom.

54. Throughout the recorded day, staff never used H.P.'s assistive communication device — his primary means of expressing his needs.

## E. The District's Own Investigation Confirmed the Abuse

55. On November 4, 2024, Amber Parker met with District administrators at the Board of Education office. She distributed a written transcript of the recording and a written statement identifying the Georgia Code of Ethics standards she believed the staff had violated. She later provided the audio itself by secure

link. The special-education specialist who oversaw the classroom cried and acknowledged that staff appeared to “turn it on and off” depending on whether an administrator was present.

56. On November 5, 2024, a District School Resource Officer reviewed the classroom surveillance audio and video. The Resource Officer documented, by timestamp, Henricks grabbing H.P. by the shirt collar and wrist, yelling “Sit down or I'm going to take it” while pushing a table against him, and removing his lunch, and noted that Ford spent much of the day on his phone.

57. On November 6, 2024, the principal of Lewiston Elementary issued written findings that Henricks' and Ford's conduct violated Standard 9 of the Georgia Code of Ethics for Educators, documenting the removal of H.P.'s lunch after nine minutes, the “hole” comment, and the physical grabbing, and recommended termination.

58. On November 8, 2024, the District's Chief Human Resources Officer delivered pre-termination letters to Henricks and Ford. Both resigned that day in lieu of termination.

59. In his written resignation notice, Ford described years of unaddressed violence in the District's special-education classrooms, stated that faculty told him and

others "not to report" incidents because "there would be no solution," and stated that he kept a personal log of incidents.

60. The District did not discipline Maynard. She remained through the end of the 2024–2025 school year, and returned to a District classroom in August 2025 for the start of the 2025-2026 school year.

61. Henderson also was not disciplined. The MSA allowed the District to request her removal and allowed Epic to end her assignment immediately if Epic determined that her "code of ethics has been compromised," and Epic's Handbook allowed Epic to discipline or terminate her for failing to report suspected abuse. Neither the District nor Epic acted. Henderson billed the District for full days of work throughout the week of November 4–8, 2024, while the District was investigating the abuse, and remained in the classroom through the end of her assignment on May 24, 2025 — months after the November 1, 2024 recording surfaced and the District confirmed the abuse.

62. On January 10, 2025, the Georgia Professional Standards Commission referred Amber Parker's complaint against Henderson — alleging violations of the Code of Ethics standards governing child abuse, confidential student information, and professional conduct — to the District for investigation.

63. On March 3, 2025, the District's Assistant Chief Human Resources Officer reported that "[n]o evidence was found to make a complaint against Ms. Henderson." The District's personnel file for Henderson reflects no interview, statement, or review of the recording concerning her.

**F. The District Failed to Report the Abuse**

64. District employees are mandatory reporters of suspected child abuse under O.C.G.A. § 19-7-5. The District never reported the abuse of H.P. to the Georgia Division of Family and Children Services or to the Columbia County Sheriff's Office.

65. Nor did the District promptly report the abuse to the Georgia Professional Standards Commission ("GPSC"). The District's complaint to the GPSC bears the date November 6, 2024, but was not signed until December 10, 2024, and the Commission did not confirm receipt until February 14, 2025. Amber Parker filed her own complaints with the Commission on December 2, 2024 — before the District's complaint was signed — against Henricks, Ford, Henderson, and Maynard.

**G. The Professional Standards Commission Found Abuse**

66. The Commission investigated Henricks and Ford, found probable cause, and recommended discipline. Neither requested a hearing.

67. On June 18, 2025, the Commission entered a Final Order suspending Henricks' educator certificate for one year, finding that she "was viewed on school surveillance video and audio physically and verbally abusing a 9-year-old student in his [ASD] class" and "withheld food from the student as a form of punishment."

68. On June 20, 2025, the Commission entered a Final Order suspending Ford's educator certificate for one year, finding that he was viewed on school surveillance video and audio verbally abusing the student and repeatedly blocking him behind his desk.

69. The Commission's investigative file reflects that the classroom video showed Henricks grabbing at least one other student by the back of his shirt, and that H.P. and his classmates were fearful of Henricks, changing their behavior and moving away when she entered the room or approached them.

**H. The District's Pattern of Abuse of Vulnerable Students**

70. The abuse of H.P. occurred against a backdrop of similar incidents in the District's schools, of which the District had notice before November 2024.

71. In November 2022, at the District's Evans Elementary School, paraprofessional James Mock restrained a ten-year-old, physically disabled student by flipping him onto the gym floor, lying on top of him with his full

body weight, and pinning his bent arm for approximately five minutes while the child screamed that he could not breathe. Mock had been reprimanded for improper restraints earlier that year. The child's family sued the District, and the District settled the case in March 2026. Mock was criminally charged.

72. In May 2023, at the District's Euchee Creek Elementary School, classroom video captured staff — including special-education teacher Christopher Jacobs — battering a student with Down syndrome and autism on at least three occasions — shoving her desk, shaking her, slapping at her face, striking her legs — and force-feeding her food to which she was known to be highly allergic. According to the family's lawsuit, the District failed to report the incidents to law enforcement and gave awards to two of the staff involved. That case is pending in the Superior Court of Columbia County.

73. In November 2023, in the same teacher's classroom, staff gave a medically fragile eleven-year-old an iPad in violation of his individualized education program, which warned that screen exposure could trigger seizures; his assigned aide left the room; and when he seized and fell, staff stepped over him and disregarded his written emergency medical plan. He suffered a hypoxic-ischemic brain injury and died in February 2025. The family's federal lawsuit against the District — which names Jacobs as a defendant —

alleges that the District showed the family surveillance video of the incident and later claimed that the video had been deleted under "routine data maintenance procedures." That case is pending in the United States District Court for the Southern District of Georgia.

74. In the spring of 2026, the District removed two more paraprofessionals — one at North Harlem Elementary and one at North Columbia Elementary — for grabbing or making inappropriate physical contact with students. Both were criminally charged with simple battery.

75. Despite this notice, the District failed to train and supervise the staff of its self-contained special-education classrooms; staffed those classrooms with unqualified or marginally qualified personnel; maintained a practice, acknowledged in writing by its own paraprofessional, of discouraging staff from reporting misconduct; failed to report abuse to the authorities as required by law; and retained and rehired implicated staff.

## I. The Harm to H.P. and His Family

76. Eleven days after the recording, the District transferred H.P. to another elementary school. His condition deteriorated. His treating providers placed him on hospital/homebound instruction from late February through May 2025.

77. He attempted a return to school in August 2025, and his providers returned him to homebound instruction in late September 2025, with a homebound teacher visiting three times per week.

78. On November 14, 2025, his parents withdrew him from the District's schools.

79. H.P.'s treating behavioral-health providers at Children's Healthcare of Atlanta documented, beginning at his first behavioral-health visit in September 2025 and repeatedly thereafter, that his aggression, mood changes, irritability, and impulsivity are related to "trauma he experienced in school" and that the "increase in behavioral change aligns with discovery of physical abuse that was occurring at school." His treating child psychiatrist added a diagnosis of anxiety disorder in November 2025.

80. A new form of aggression — biting, kicking, and related behaviors his providers agree emerged only in late 2024, coinciding with the discovery of the abuse — required an entirely new psychiatric medication regimen beginning in mid-2025 and intensive applied behavior analysis therapy prescribed at more than thirty hours per week. At intake, H.P.'s ABA providers recorded baseline rates of physical aggression that included dozens of bites per hour and documented that H.P. no longer knows how to play with other children.

81. H.P. suffered physical pain, fear, humiliation, hunger, confinement, and lasting psychological injury. His parents have incurred and will continue to incur substantial expenses for his psychiatric, behavioral, and therapeutic care, have lost time from work and income caring for him, and have lost his services.

## V. CLAIMS FOR RELIEF

### COUNT I
### 42 U.S.C. § 1983 — Fourteenth Amendment Substantive Due Process
### (Against Defendant Henricks)

82. Plaintiffs incorporate the foregoing paragraphs.

83. H.P. has a clearly established Fourteenth Amendment right to bodily integrity and personal security, including the right to be free from a school official's intentional, obviously excessive, and malicious use of force.

84. Acting under color of state law, Henricks intentionally grabbed H.P. by the collar and wrist, pushed a table against him, confined him, withheld his food as punishment, and subjected him — a nonverbal, disabled nine-year-old — to sustained verbal abuse.

85. Her force and abuse were obviously excessive, served no legitimate pedagogical purpose, presented a foreseeable risk of serious harm to a

medically fragile child with epilepsy, and were undertaken maliciously rather than in any good-faith effort to maintain discipline.

86. As a paraprofessional, Henricks had no legal authority to administer corporal punishment of any kind. O.C.G.A. §§ 20-2-215, 20-2-731. Her use of force was unauthorized from the outset.

87. Henricks' conduct shocks the conscience and violated H.P.'s substantive due process rights, proximately causing his physical and psychological injuries. She is liable for compensatory damages, and her reckless and callous indifference to H.P.'s rights supports punitive damages.

## COUNT II
## 42 U.S.C. § 1983 — Fourteenth Amendment Substantive Due Process (Against Defendant Ford)

88. Plaintiffs incorporate the foregoing paragraphs.

89. Acting under color of state law, Ford repeatedly confined H.P. by blocking him behind his desk and subjected him to sustained verbal abuse and intimidation — conduct the Professional Standards Commission found on the video and audio record and for which Ford's certificate was suspended.

90. As a paraprofessional, Ford had no legal authority to administer corporal punishment of any kind. O.C.G.A. §§ 20-2-215, 20-2-731. His use of force was unauthorized from the outset.

91. Ford's intentional confinement and abuse of a nonverbal, disabled child was obviously excessive, served no legitimate purpose, and was undertaken maliciously rather than in any good-faith effort to maintain discipline. It violated H.P.'s clearly established substantive due process rights and proximately caused his injuries. Ford's reckless and callous indifference to H.P.'s rights supports punitive damages.

**COUNT III**
**42 U.S.C. § 1983 — Municipal Liability**
**(Against the District)**

92. Plaintiffs incorporate the foregoing paragraphs.

93. The constitutional violations alleged above resulted from the District's own customs, practices, and deliberate choices, including: (a) a persistent and widespread practice of physical mistreatment of vulnerable students in the District's schools, of which the District had actual or constructive notice through, *inter alia*, the Evans Elementary and Euchee Creek Elementary incidents and the warnings in H.P.'s own classroom; (b) the District's failure to train the staff of its self-contained special-education classrooms in lawful behavior management, restraint, communication, and the care of nonverbal and medically fragile children, despite the obvious need for such training; (c) the District's failure to supervise those classrooms, including its practice of

leaving self-contained classrooms in the hands of unsupervised paraprofessionals and marginally qualified contract teachers; (d) a practice of discouraging staff from reporting misconduct, reflected in Ford's written statement that faculty told staff "not to report"; and (e) the District's practice of failing to report abuse to the authorities and of retaining, rehiring, and even rewarding implicated staff.

94. These customs and failures reflect the District's deliberate indifference to the known and obvious risk that the staff of its special-education classrooms would violate the constitutional rights of disabled students. That deliberate indifference was the moving force behind the violation of H.P.'s rights.

95. The District is liable under 42 U.S.C. § 1983 for the resulting injuries.

## COUNT IV
## Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and Title II of the ADA, 42 U.S.C. § 12132 (Against the District)

96. Plaintiffs incorporate the foregoing paragraphs.

97. H.P. is a qualified individual with a disability. The District receives federal financial assistance and is a public entity.

98. The abuse of H.P. was by reason of his disability. Staff targeted and mistreated him because of, and in open contempt for, his autism and his inability to speak or report: they mocked his disability, derided "parents trying to diagnose

children," ridiculed his upcoming psychological evaluation, refused to use his assistive communication device, and exploited his inability to tell anyone what they did.

99. The District acted with deliberate indifference. It had actual knowledge of the risk to disabled students in its self-contained classrooms — from the prior incidents, from the parents' escalating complaints, and from its own staff — and it failed to respond reasonably. After the abuse was confirmed, it retained two implicated staff members, failed to report the abuse to the authorities, and delayed its report to the Professional Standards Commission.

100. The abuse and the District's indifference were severe and pervasive: they denied H.P. the benefits of the District's educational programs, drove him from in-person schooling to homebound instruction, and ultimately drove him from the District's schools altogether.

101. The District is liable to Plaintiffs for compensatory damages under Section 504 and Title II.

## COUNT V
## Battery (Georgia Law)
## (Against Defendant Henricks)

102. Plaintiffs incorporate the foregoing paragraphs.

103. Henricks intentionally made harmful and offensive physical contact with H.P., including grabbing him by the shirt collar and pulling him backwards, seizing his wrist, and pushing a table against him. H.P. could not and did not consent.

104. Henricks acted with actual malice and the deliberate intention to do wrong, depriving her of official immunity under Georgia law. She is liable for compensatory damages and, under O.C.G.A. § 51-12-5.1, punitive damages.

## COUNT VI
**False Imprisonment (Georgia Law)**
**(Against Defendants Henricks and Ford)**

105. Plaintiffs incorporate the foregoing paragraphs.

106. Henricks and Ford unlawfully detained and confined H.P. against his will — Henricks by ordering him to stay in a defined area ("your hole," "the box") and pinning him in place with furniture, and Ford by repeatedly blocking him behind his desk — depriving H.P. of his personal liberty without legal authority or any legitimate educational justification.

107. Each acted with actual malice and the deliberate intention to do wrong, depriving them of official immunity. Each is liable for compensatory and punitive damages.

## COUNT VII
**Intentional Infliction of Emotional Distress (Georgia Law)**

**(Against Defendants Henricks and Ford)**

108. Plaintiffs incorporate the foregoing paragraphs.

109. Henricks' and Ford's conduct — the sustained abuse, confinement, food deprivation, and mockery of a nonverbal, disabled nine-year-old who could not report it — was extreme, outrageous, and intolerable in a civilized community. They acted intentionally or recklessly, and their conduct caused H.P. severe emotional distress, as documented by his treating psychiatric providers.

110. Each acted with actual malice, depriving them of official immunity, and each is liable for compensatory and punitive damages.

## COUNT VIII
**Negligence, Negligent Supervision and Gross Negligence (Georgia Law)**
**(Against Defendant Henderson)**

111. Plaintiffs incorporate the foregoing paragraphs.

112. As the classroom's teacher, Henderson owed H.P. legal duties. She owed a duty to protect the students in her classroom from harm, including harm inflicted by the paraprofessionals working under her. She owed a duty to supervise Henricks and Ford, who could lawfully act only under the direct supervision of a classroom teacher. O.C.G.A. § 20-2-215. And she owed a duty to report suspected child abuse. O.C.G.A. § 19-7-5.

113. Henderson breached each duty. She watched Henricks and Ford abuse H.P. She did not stop them. She did not report them. She joined the staff's derision of H.P. and his family. And she failed to supervise, direct, or control the paraprofessionals working in her classroom.

114. Henderson's breaches proximately caused H.P.'s injuries. She is liable for compensatory damages. Henderson's conduct — watching the abuse of a nonverbal, disabled child in her charge, doing nothing to stop or report it, and joining in the derision of the child and his family — was willful and wanton and showed that entire want of care which raises the presumption of conscious indifference to consequences, entitling Plaintiffs to punitive damages against her under O.C.G.A. § 51-12-5.1.

115. Henderson was Epic's employee and was leased to the District as an independent contractor. Epic and the District agreed in the MSA that Epic's personnel perform all services as independent contractors to the District, "not as an employee, agent, partner, or venture participant" of the District. Epic paid her, insured her, disciplined her, and could reassign or discharge her; the District could not. She was not an officer or employee of the State or of the District. Georgia's official immunity protects only public officers and employees, Ga. Const. Art. I, § II, ¶ IX(d), and does not extend to privately

employed contractors or their employees. *See Cantrell v. Thurman*, 231 Ga. App. 510 (1998); *Hinson v. Edmond*, 192 F.3d 1342, 1347 (11th Cir. 1999). No official or sovereign immunity shields Henderson from these claims. In the alternative, her conduct showed actual malice and an actual intent to cause injury, defeating any immunity she might assert.

**COUNT IX**
**Respondeat Superior (Georgia Law)**
**(Against the Epic Defendants)**

116. Plaintiffs incorporate the foregoing paragraphs.

117. Henderson committed the acts and omissions alleged above in the scope of her employment with Epic, while performing the classroom services that Epic supplied to the District for a fee. Both 3Chords and TherapyTravelers are parties to the MSA and to the Staffing Confirmation Agreement that placed Henderson in H.P.'s classroom, and that agreement acknowledges that Henderson "is an employee of Epic Special Education Staffing."

118. Epic retained the right to control Henderson's employment throughout her assignment. Epic — not the District — paid her wages and benefits, set the at-will terms of her employment, reserved the authority to discipline, reassign, and terminate her, approved her timesheets, designated its own personnel as her supervisors alongside the District's, and could withdraw her from the

assignment at any time. The District could request her removal but could not discharge her from Epic's employ. Henderson was not a borrowed servant of the District.

119. The Epic Defendants are therefore vicariously liable for Henderson's negligence and other torts committed in the scope of her employment. *See* O.C.G.A. § 51-2-2.

**COUNT X**
**Negligent Hiring, Retention, and Placement (Georgia Law)**
**(Against the Epic Defendants)**

120. Plaintiffs incorporate the foregoing paragraphs.

121. The Epic Defendants owed a duty of reasonable care in selecting, vetting, and placing the personnel they supplied to run special-education classrooms. They breached that duty. They placed in a self-contained classroom of nonverbal, disabled children a teacher who held herself out as having a master's degree she did not have, and — by the MSA's own terms — they performed only a limited background check and limited reference inquiries and undertook no additional verification of her credentials, qualifications, or suitability.

122. The Epic Defendants knew or should have known that Henderson was unsuited to supervise a self-contained special-needs classroom without

adequate vetting, training, and oversight. Their breaches proximately caused H.P.'s injuries, and they are liable for compensatory damages.

123. The Epic Defendants also negligently retained Henderson. Epic's own policy required Henderson to report the abuse she witnessed on November 1, 2024 to her Company Supervisor, and Epic had trained her to do so seven weeks earlier. Either Henderson reported the abuse to Epic and Epic did nothing, or Epic failed to supervise its employee closely enough to learn that the classroom she ran was under investigation for child abuse. In either event, Epic — which could have ended her placement immediately — left her in the classroom for nearly seven more months.

**COUNT XI**

**Parents' Individual Claims for Expenses and Loss of Services (Georgia Law)**
**(Against Defendants Henricks, Ford, Henderson, and the Epic Defendants)**

124. Plaintiffs incorporate the foregoing paragraphs.

125. Under Georgia law, parents are responsible for the medical and related expenses of their minor child, and the right to recover those expenses from a tortfeasor — together with the value of the child's services during minority — belongs to the parents, not the child. O.C.G.A. § 19-7-2. Chadwick and Amber Parker assert this Count in their individual capacities.

126. As a direct and proximate result of the conduct of Henricks, Ford, and Henderson described above, for which the Epic Defendants are liable as alleged in Counts IX and X, Chadwick and Amber Parker have incurred, and will continue to incur throughout H.P.'s minority, expenses for his medical, psychiatric, behavioral-therapy, educational, and related care; have provided and will continue to provide care to H.P. themselves, the reasonable value of which they are entitled to recover; have lost income in order to provide and obtain that care; and have lost the services of their child.

127. Defendants Henricks, Ford, Henderson, and the Epic Defendants are liable to Chadwick and Amber Parker, individually, for these damages in an amount to be proven at trial.

## VI. DAMAGES

128. As a direct and proximate result of Defendants' conduct, H.P. suffered physical pain, hunger, fear, humiliation, and serious and continuing psychological injury, including trauma-related aggression and an anxiety disorder, requiring psychiatric care, intensive behavioral therapy, and medication, and the loss of his ability to attend school in person.

129. Chadwick and Amber Parker, individually, have incurred and will continue to incur medical, psychiatric, behavioral-therapy, educational, and related

expenses on H.P.'s behalf; have provided care to H.P. whose reasonable value they are entitled to recover; have lost income; and have lost the services of their child.

130. The individual Defendants' conduct showed willful misconduct, malice, and that entire want of care which raises the presumption of conscious indifference to consequences, entitling Plaintiffs to punitive damages under 42 U.S.C. § 1983 and O.C.G.A. § 51-12-5.1.

131. Plaintiffs are entitled to recover their reasonable attorney's fees and costs under 42 U.S.C. § 1988, 29 U.S.C. § 794a, and 42 U.S.C. § 12205.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

(a) Enter judgment for Plaintiffs and against Defendants on all counts;

(b) Award compensatory damages against all Defendants, jointly and severally, in an amount the jury determines;

(c) Award punitive damages against Defendants Henricks, Ford, and Henderson;

(d) Award Plaintiffs their reasonable attorney's fees and costs under 42 U.S.C. § 1988, 29 U.S.C. § 794a, and 42 U.S.C. § 12205;

(e) Award pre- and post-judgment interest as allowed by law; and

(f) Grant such other and further relief as is just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted this 29th day of October 2026.

**FRIED BONDER WHITE, LLC**

*/s/ Joseph A. White*
Joseph A. White
Georgia Bar No. 754315
730 Peachtree Street NE, Suite 600
Atlanta, GA 30308
Phone: (404) 995-8808
Facsimile: (404) 995-8899
jwhite@friedbonder.com

*Attorneys for Plaintiffs*